IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANYEL GIACOMELLI, | ) | CASE NO.  1:23-CV-01787-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |
| | ) | |

Plaintiff, Danyel Giacomelli ("Plaintiff" or "Giacomelli"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

In August 2018, Giacomelli filed an application for POD and DIB, alleging a disability onset date of May 21, 2014[2] and claiming she was disabled due to bilateral carpal tunnel syndrome ("CTS"), peripheral neuropathy, chronic pain syndrome, cervical degenerative disc disease, cervical spondylosis, bilateral epicondylitis, obesity, connective tissue disease, fibromyalgia, and hip and knee pain.  (Transcript

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.
[2] As a result of a prior unfavorable ALJ decision dated January 31, 2018, the unadjudicated period in this case is February 1, 2018 through December 31, 2019, Giacomelli's date last insured.  (Tr. 90-102, 347.)

("Tr.") at 113, 149.)   The application was denied initially and upon reconsideration, and Giacomelli requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 149.)

On January 27, 2020, an ALJ held a hearing, during which Giacomelli, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)   On February 5, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 149-60.)  On August 21, 2020, the Appeals Council remanded the case back to the ALJ for proper consideration of the medical source opinions in the record. (*Id.* at 165-67.)

On January 7, 2021, the ALJ held a second hearing, during which Giacomelli, represented by counsel, and an impartial VE testified.  (*Id.* at 173.)   On January 29, 2021, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 173-86.)  On February 17, 2022, the Appeals Council remanded the case to another ALJ for, in part, further consideration of the prior administrative medical findings.  (*Id.* at 192-95.)

The new ALJ did not hold another hearing.  (*Id.* at 11.)  On August 15, 2022, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 10-24.)  The ALJ's decision became final on August 4, 2023, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On September 14, 2023, Giacomelli filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8, 10.)  Giacomelli asserts the following assignments of error:

(1)  The ALJ erred in evaluating the opinions of state agency physicians and failed to adequately explain the rationale in support of the decision.

(2)  The ALJ erred in her assessment of Ms. Giacomelli's residual functional capacity as she failed to evaluate the totality of other evidence in the record and consider limitations arising from Plaintiff's impairments.

(Doc. No. 8.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Giacomelli was born in August 1970 and was 49 years-old on her date last insured (Tr. 23), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  She has at least a high school education.  (Tr. 23.)  She has past relevant work as a data entry clerk.  (*Id.*)

### B.    Relevant Medical Evidence[3]

On February 16, 2016, Giacomelli underwent nerve conduction studies, which revealed bilateral mild recurrent carpal tunnel syndrome, bilateral mild ulnar compression neuropathy at the elbow, bilateral multi-level cervical radiculopathy, no evidence of ulnar compression neuropathy at the canal of guyon bilaterally, no peripheral neuropathy, and no myopathy.  (*Id.* at 468.)

On May 9, 2017, Giacomelli saw Alan Panteck, M.D., for follow up regarding her hands. (*Id.* at 486-87.)  Giacomelli reported bilateral elbow pain, right worse than left, and the pain radiated down her arms.  (*Id.* at 486.)  On examination of the right arm, Dr. Panteck found tenderness to palpation over the lateral epicondyle, "significant pain with resisted wrist and finger extension," and no tenderness over the medial epicondyle.  (*Id.*)  On examination of the left arm, Dr. Panteck found tenderness over the lateral epicondyle, although not to the same degree as on the right, and "mild pain with resisted wrist and finger extension."  (*Id.*)  Dr. Panteck diagnosed Giacomelli with bilateral lateral epicondylitis and discussed treatment options with her.  (*Id.*) Giacomelli elected to undergo bilateral Kenalog injections, which Dr. Panteck administered that day.  (*Id.*)

On May 18, 2017, Giacomelli saw Jason Sustersic, D.O., for issues including sleep problems and bilateral wrist and elbow pain. (*Id.* at 483.)  Giacomelli thought her pain was partly responsible for her sleep problems.  (*Id.*)  She reported receiving injections for her CTS and lateral epicondylitis, which

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

provided minimal relief.  (*Id.*)  On examination, Dr. Sustersic found no joint swelling, normal movements of all extremities, and normal range of motion.  (*Id.* at 484.)  Dr. Sustersic recommended wearing wrist braces at bedtime and icing the wrists and elbows for 20-30 minutes two to three times a day.  (*Id.* at 485.)

On July 21, 2017, Giacomelli saw Dr. Sustersic for complaints of right elbow pain.  (*Id.* at 480.) On examination, Dr. Sustersic found tenderness to palpation of the right lateral upper condyle.  (*Id.* at 482.)  Dr. Sustersic prescribed a Medrol Dosepak.  (*Id.*)

On September 24, 2018, Giacomelli completed an Adult Function Report with the help of her husband.  (*Id.* at 390-97.)  Giacomelli reported she was unable to do small detail work, anything repetitive, or pick up anything heavier than a gallon of milk.  (*Id.* at 390.)  She drops things easily and cannot write more than a few words at a time.  (*Id.*)  Her hands swell to the point where she cannot move her fingers. (*Id.*)  Her elbows hurt because she tries not to move her wrists and uses her elbows instead.  (*Id.*)  When she wakes up, she removes her braces and tries to be productive, but she ends up making a mess.  (*Id.* at 391.)  Her daughter comes over to help her try and clean her house.  (*Id.*)  She does not wear anything tight, and wears slip on shoes and slipper socks.  (*Id.*)  On bad days, her husband helps her bathe.  (*Id.*) Her husband brushes her hair and shaves for her.  (*Id.*)  Her family helps her with everything.  (*Id.*)  She can put premade meals in the microwave or oven if they are not heavy.  (*Id.* at 392.)  She tries to vacuum with the 4.5-pound vacuum they have and puts laundry in the washer and dryer.  (*Id.*)  She can hang clothes.  (*Id.*)  It takes her all day, but she tries to do something every day.  (*Id.*)  She cannot carry laundry to the washer.  (*Id.*)  She can drive a car short distances.  (*Id.* at 393.)  She goes with someone to get the groceries they order on the Walmart app for pick up.  (*Id.*)  All their bills are on auto pay.  (*Id.*)  She does not leave the house.  (*Id.* at 394.)  She follows written and spoken instructions well.  (*Id.*)  She can read some things, but it is too hard to turn the pages.  (*Id.* at 395.)  She gets numbness or pain by moving her hand or wrist, and her elbows throb like she hit her funny bone.  (*Id.* at 397.)

4

On October 11, 2018, Giacomelli saw Dr. Panteck for complaints of right shoulder pain after falling on it when trying to get into a truck. (*Id.* at 497.) Giacomelli reported most of the pain was located on the superior aspect of her right shoulder, and it had only improved a little since her fall over three weeks ago. (*Id.*) On examination, Dr. Panteck found pain free range of motion of the elbow and wrist, active forward elevation of about 150 degrees, with anything beyond that point eliciting pain, tenderness anterolaterally and directly over the acromion, no tenderness posteriorly, negative Hawkins test, pain with resisted elevation, and no pain with resisted external rotation. (*Id.* at 499.) Right shoulder x-rays taken that day revealed a possible nondisplaced acromion fracture. (*Id.*) Dr. Panteck advised Giacomelli that she could use her right upper extremity as much as pain allowed and to follow up in approximately five weeks with x-rays of the right shoulder. (*Id.* at 500.)

On October 13, 2018, Giacomelli saw Ashley Fuentes, D.O., for a physical consultative examination. (*Id.* at 502.) Giacomelli reported chronic pain in her upper extremities and "lots of pain" in her elbows. (*Id.*) She told Dr. Fuentes she had underwent CTS surgery 20 years earlier, and she did not get any relief from the surgery. (*Id.*) Giacomelli endorsed continued weakness in her hands and "constantly drop[ping] things," and said her doctors told her she was not able to have a CTS revision. (*Id.*) Giacomelli reported a fall two weeks earlier in which she broke her collar bone. (*Id.*) Because of her pain and weakness in her upper extremities, she could not do "simple things," her husband had to do her hair, and her family had to help her get dressed. (*Id.*) On examination, Dr. Fuentes found decreased strength and range of motion of the right shoulder secondary to recent injury, with "[l]ots of guarding" and unwillingness for Dr. Fuentes to move Giacomelli through range of motion. (*Id.* at 503.) Dr. Fuentes further found tenderness over the left greater trochanter, abnormal pinch on the left and right, and normal gait. (*Id.* at 503, 505.) Dr. Fuentes opined:

> Based on today's exam, the claimant does not appear to have limitations with
> sitting, standing, hearing, speaking, or memory. Due to her most recent injury

> to her collar bone, I was unable to fully examine the extent and limitations of her chronic pains.  Today, she has limitations of lifting, carrying, handling, and traveling.

(*Id.* at 503.)

On October 17, 2018, Giacomelli saw Dr. Sustersic for complaints of broken right acromion and right arm pain.  (*Id.* at 558.)  Dr. Sustersic noted a history of fibromyalgia, which was controlled on Giacomelli's current medication.  (*Id.*)  Giacomelli reported worsening pain that she rated as a 6/10, and ice and Advil provided minimal relief.  (*Id.*)  On examination, Dr. Sustersic found right shoulder tenderness to palpation, normal stability, normal muscle tone, and normal strength.  (*Id.* at 560.)  Dr. Sustersic prescribed a Medrol Dosepak and continued Giacomelli's current medication for fibromyalgia. (*Id.*)

On January 23, 2019, Giacomelli saw Dr. Panteck for complaints of right shoulder and left thumb pain. (*Id.* at 513.)  Giacomelli reported a feeling of fullness within her right shoulder and endorsed difficulty with overhead activities, although the pain had improved since the last time when she was seen with an acromion fracture.  (*Id.*)  Giacomelli also reported pain at the base of her left thumb and difficulty gripping heavy objects.  (*Id.*)  She denied any numbness or tingling in her bilateral upper extremities.  (*Id.*) On examination of the right shoulder, Dr. Panteck found active forward elevation to about 155 degrees, positive Hawkins test, complaints of increased pain with resisted forward elevation and resisted external rotation, tenderness over the anterolateral acromion, and negative liftoff test.  (*Id.* at 515.)  On examination of the left thumb, Dr. Panteck found tenderness at the first CMC joint, positive first CMC grind, negative Finkelstein test, and no evidence of a left trigger thumb.  (*Id.*)  X-rays taken that day showed a healed acromion fracture and no evidence of first CMC arthritis.  (*Id.*)  Dr. Panteck administered a Kenalog injection to the right shoulder.  (*Id.*)  Giacomelli's diagnoses included arthralgia of the left wrist and internal impingement of the right shoulder.  (*Id.*)  Dr. Panteck thought Giacomelli's left thumb pain was likely from overuse and recommended anti-inflammatories as needed.  (*Id.* at 516.)

On February 2, 2019, Giacomelli saw Rikesh Patel, D.O., also examined for a physical consultative examination. (*Id.* at 525, 529.)  Dr. Patel noted Giacomelli sought disability because of right shoulder problems.  (*Id.* at 525.)  Giacomelli reported pain and limited movement of the right shoulder that was exacerbated by activity and improved with rest.  (*Id.*)  Giacomelli rated her pain as a 5/10 on most days and a 5/10 on the date of examination.  (*Id.*)  She told Dr. Patel her pain affected her ability to work because of difficulty lifting and reaching.  (*Id.*)  Giacomelli reported her daily activities consisted of doing housework, walking, washing dishes, and driving.  (*Id.*) On examination, Dr. Patel found decreased sensation to light touch of the bilateral hands at the medial nerve distribution, tenderness of the right AC joint, tenderness of the bilateral hands and wrists, tenderness of the bilateral greater trochanters, and "grossly normal" fine and gross manipulation.  (*Id.* at 528.)  Dr. Patel further found Giacomelli could "lift, carry and handle light objects."  (*Id.*)  Dr. Patel opined as follows:

> The claimant has moderate limitations with lifting and carrying weight due to right shoulder pain.  There are no limitations on bending, stooping, crouching and squatting.  There are limitations with reaching, grasping, handling, fingering and feeling and the claimant will be able to perform these occasionally due to right shoulder pain.

(*Id.* at 529.)

On May 31, 2019, Giacomelli saw Dr. Sustersic for complaints of wrist pain.  (*Id.* at 554.) Giacomelli reported worsening bilateral carpal tunnel syndrome and asked for disability paperwork to be completed.  (*Id.*)  She told Dr. Sustersic she was wearing braces, but her symptoms were not improving; she was dropping things more often, she was having trouble with fine manipulation, and she could not carry anything more than one pound regularly and five pounds occasionally.  (*Id.*)  Giacomelli stated she was having a hard time finding a job that met her restrictions.  (*Id.*)  She also reported her fibromyalgia was stable on her medication, but she complained of fatigue, generalized weakness, and increasing joint pain.  (*Id.*)  Dr. Sustersic did not conduct a musculoskeletal examination.  (*Id.* at 556.)  Dr. Sustersic prescribed medication for generalized anxiety, continued Giacomelli's fibromyalgia medication, and

instructed her to continue bracing and icing for her CTS.  (*Id.* at 557.)  Dr. Sustersic suggested Giacomelli consider a follow up with orthopedics.  (*Id.*)

That same day, Dr. Sustersic completed a medical assessment regarding Giacomelli's physical capacity.  (*Id.* at 536-37.)  Dr. Sustersic opined that lifting/carrying was not affected by Giacomelli's impairment, but then went on to opine that Giacomelli could occasionally lift/carry five pounds and frequently lift/carry less than five pounds.  (*Id.* at 536.)  She could rarely climb, balance, stoop, crouch, kneel, and crawl.  (*Id.*)  She could rarely reach, push/pull, and perform fine and gross manipulation.  (*Id.* at 537.)  She must avoid heights and moving machinery.  (*Id.*)  Giacomelli experienced severe pain that would interfere with concentration, take her off task, and cause absenteeism.  (*Id.*)  The medical findings supporting these limitations consisted of left wrist weakness and right shoulder pain.  (*Id.* at 536-37.)

On December 19, 2019, Giacomelli saw Dr. Panteck for follow up of her left first CMC arthritis. (*Id.* at 575.)  Giacomelli reported "mild relief" from the injection she received in January, and she preferred another injection as opposed to surgery.  (*Id.*)  She endorsed continued difficulty with dropping things.  (*Id.*)  On examination, Dr. Panteck found tenderness at the first CMC joint, negative Finkelstein test, no evidence of trigger thumb, and positive first CMC grind.  (*Id.* at 577.)  Giacomelli's diagnoses consisted of Dupuytren contracture, localized primary osteoarthritis of the carpometacarpal joint of the left thumb, and arthralgia of the left wrist.  (*Id.*)  Dr. Panteck administered an injection that day.  (*Id.* at 577-78.)

On January 10, 2020, Giacomelli saw Dr. Sustersic for follow up of her left wrist pain.  (*Id.* at 593.)  Giacomelli reported little relief from the injection she received two weeks earlier and wondered if there were any conservative options she could try before surgery.  (*Id.*)  On examination, Dr. Sustersic found tenderness to palpation of the left wrist, mostly on the anterior aspect at the base of the thumb, normal range of motion, normal muscle tone, and normal strength.  (*Id.* at 594.)  Dr. Sustersic told

8

Giacomelli there were not many other options available.  (*Id.* at 595.)  He recommended she try diclofenac gel four times a day, brace day and night, ice for 20-30 minutes two to three times a day, and perform range of motion exercises.  (*Id.*)

**C.**     **State Agency Reports**

On November 2, 2018, David Knierim, M.D., reviewed the file and opined that Giacomelli could occasionally lift and/or carry 10 pounds and frequently lift and/or carry 10 pounds.  (*Id.* at 121, 124.)  She could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday.  (*Id.* at 121.)  She could occasionally push and/or pull with the bilateral upper extremities.  (*Id.* at 121-22.)  She could frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  (*Id.* at 122.)  She could frequently balance, stoop, kneel, and crouch.  (*Id.*)  She could never crawl.  (*Id.*)  She could occasionally reach overhead on the right.  (*Id.* at 123.)  She could frequently handle and finger.  (*Id.*)  She must avoid all exposure to hazards.  (*Id.*)

On February 19, 2019, on reconsideration, Gerald Klyop, M.D., affirmed Dr. Knierim's findings. (*Id.* at 139-42.)

**D.**     **Hearing Testimony**

During the January 7, 2021 hearing, Giacomelli testified to the following:

- She lives with her husband.  (*Id.* at 58.)  Her son lived with them during the relevant time, and he helped a lot.  (*Id.* at 63.)

- She can drive two to three miles.  (*Id.* at 58.)  She cannot drive farther than that because of the pain in her hands and elbows, as well as the loss of feeling in her hands.  (*Id.*)

- During the relevant time, she could do very little around the house.  (*Id.* at 58-59.) She could not pick up the laundry basket in the bedroom and bring it to the laundry room.  (*Id.* at 59.)  She could only pick up one piece of clothing at a time.  (*Id.*)  She could not go get groceries or unload the groceries.  (*Id.*)  She constantly dropped and broke things, even in stores.  (*Id.*)  Her husband had to help her wash and brush her hair, if she even brushed her hair.  (*Id.*)  She had trouble raising her arm to put on a shirt, perform self-care, or do chores.  (*Id.*)  She could no longer make meals or pick up pots of liquid.  (*Id.*)  She could barely care for herself.  (*Id.*)  She broke all the

glasses in the house.  (*Id.*)  They used plastic glasses and paper plates because she dropped everything.  (*Id.*)  She could not lift them.  (*Id.*)  Any repetitive movement hurt her hands, wrists, and shoulders.  (*Id.* at 60.)  She tried to be productive, but it always ended badly because she broke things.  (*Id.*)  She could not open the lids on her medications.  (*Id.*)  She could not perform fine motor skills.  (*Id.*)  She could not pick up a penny if she dropped it.  (*Id.*)

- She has no feeling in her hands.  (*Id.* at 59.)  She has to be able to see what she is doing because she cannot feel what she is touching.  (*Id.*)  She has lost money.  (*Id.*)

- Her pain is in her right shoulder, hands, and elbows.  (*Id.* at 60.)  Her left shoulder hurts too.  (*Id.*)  Her right hand is a little stronger than her left.  (*Id.*)  She is left-handed.  (*Id.*)  Her pain averages an 8/10 and it will remain there if she does not move or do anything.  (*Id.* at 60-61.)  Using her hands triggers her pain and it snowballs from there.  (*Id.* at 61.)  She does not want to take narcotics.  (*Id.*)  Her pain is above an 8/10 at least five days a week.  (*Id.*)  On those days, she does not leave her house and she cannot function at all.  (*Id.* at 62.)  She wears two braces. (*Id.* at 64.)  On her right hand, she has a brace she wears during the day to keep her wrist from moving and for support.  (*Id.*)  On her left hand, she has a brace for her thumb.  (*Id.*)  She wears braces at night for CTS.  (*Id.*)  The only thing that helps with the pain and numbness is not moving her hands.  (*Id.*)  But even then, her hands throb.  (*Id.*)  She has tried injections.  (*Id.* at 65.)  Her doctors told her she was not a candidate for surgery and that physical therapy would not help.  (*Id.*)  There is nothing she can do for the pain.  (*Id.*)  The cortisone shots last two weeks.  (*Id.*)  She could go to pain management, but that is just prescription drugs, and no one has told her it will do anything for her.  (*Id.*)  She has seen a neurologist and a rheumatologist. (*Id.*)  Her primary care physician gives her steroids.  (*Id.*)  She takes medication for nerve pain to try and keep the pain under control, but she has been told there is nothing she can do to fix it.  (*Id.*)

- She cannot lift a gallon of milk.  (*Id.* at 62.)  If she tried, she would get pain in her wrist and elbow, and she would drop it.  (*Id.*)  It hurts to reach above her head.  (*Id.* at 63.)  It's painful to reach and try and grab something.  (*Id.*)  She can answer her cellphone, but she drops it a lot.  (*Id.*)  She does not use a computer.  (*Id.*)  Her daughters help her whenever they are around.  (*Id.*)  Their bills are set up for automatic pay so that she doesn't have to write checks or be on the computer.  (*Id.*) If her family texts her, she can see the text, but she doesn't text back.  (*Id.* at 64.)  She cannot answer the phone.  (*Id.*)  The most she has written during the relevant time would be a check.  (*Id.*)  She could not write at all on a bad day.  (*Id.* at 65.)  When she goes to the doctor, the nurse helps her because she cannot fill out the paperwork. (*Id.*)

The ALJ invoked the *Dennard* rule and found Giacomelli had past relevant as a data entry clerk.

(*Id.* at 66.)  The ALJ then posed the following hypothetical question:

10

> I'd like you to assume an individual who during the period at issue was under
> the age of 50. So she was a younger individual through the date last insured
> of December 31, 2019. She has a 12-year education, plus two years of
> college. Therefore, she can read and write and perform arithmetic; has a work
> background as a data entry clerk. This individual is limited to work a [sic]
> light exertional requirements with additional, non-exertional limitations.
> Specifically, no climbing of ladders, ropes, or scaffolds or crawling.
> Occasional climbing of ramps and stairs, balancing, stooping, kneeling,
> crouching, and overhead reaching; frequent handling, fingering, and lateral
> reaching; and no exposure to extreme cold, vibrations or hazards such as
> heights, machinery, commercial driving. Could this individual perform past
> work as a data entry clerk?

(*Id.* at 66-67.)

The VE testified the hypothetical individual would not be able to perform Giacomelli's past work as a data entry clerk. (*Id.* at 67.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cashier II and counter clerk. (*Id.* at 68.)

In response to questioning from Giacomelli's counsel, the VE testified the counter clerk job would remain at the same numbers if the hypothetical individual was limited to occasional handling and fingering. (*Id.* at 70.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Giacomelli was insured on February 1, 2018, the start of the unadjudicated period, and remained insured through December 31, 2019, the date last insured ("DLI").  (Tr. 11-12.) Therefore, in order to be entitled to POD and DIB, Giacomelli must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2019.

2.    The claimant did not engage in substantial gainful activity during the unadjudicated period from February 1, 2018 through her date last insured of December 31, 2019 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: carpal tunnel syndrome, status post-surgical release; degenerative disc disease of the cervical spine with radiculopathy and spondylosis; connective tissue disorder; status-post right clavicular fracture; and shoulder impingement syndrome (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no climbing of ladders, ropes, or scaffolds; no crawling; frequent balancing; occasional climbing of ramps and stairs, stooping, kneeling, crouching, and overhead reaching; frequent handling, fingering, and lateral reaching; and no exposure to extreme cold, vibration, or hazards (heights, machinery, commercial driving).

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on August **, 1970, and was 49 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

13

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from the beginning of the unadjudicated period commencing on February 1, 2018 through December 31, 2019, the date last insured (20 CFR 404.1520(g)).

(Tr. 14-24.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because

14

there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.  Opinion Evidence

In her first assignment of error, Giacomelli argues the ALJ "committed reversible error when she failed to properly consider the opinions of State agency physicians Drs. Knierim and Klyop, finding these opinions 'not persuasive' as they related to Ms. Giacomelli's ability to lift and carry 10 pounds."  (Doc.

15

No. 8 at 12.)  While the ALJ gave reasons for finding these doctors' assessments inconsistent with evidence post-dating these doctors' review of the file, Giacomelli asserts the ALJ's reasoning lacks the support of substantial evidence.  (*Id.* at 13-14.)  Giacomelli maintains that the opinions of the state agency reviewing physicians are consistent with the opinion of Dr. Sustersic, who opined in May 2019 that Giacomelli would be limited to lifting and carrying five pounds, and with Giacomelli's statements and testimony that she could not lift more than a gallon of milk.  (*Id.* at 15.)

The Commissioner responds that substantial evidence supports the ALJ's evaluation of the opinions of the state agency reviewing physicians.  (Doc. No. 10 at 9-11.)  The Commissioner argues that Giacomelli's argument is an improper request for the Court to reweigh the evidence.  (*Id.* at 11.)

Since Giacomelli's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

16

relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

17

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).   A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the state agency's reviewing opinions as follows:

> State agency medical consultants reviewed the claimant's file at the initial and consideration levels (Exhibits B3A and B5A). On November 2, 2018, state agency medical consultant opined that the claimant could lift and carry 10 pounds occasionally and frequently; she could stand and or walk 6 hours in an 8-hour workday; pushing and pulling was limited in both upper extremities; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, kneel, stoop, crouch; never crawl; occasionally reaching overhead on the right; frequent handling and fingering; and she must avoid all hazards (Exhibit B3A/12). This opinion was affirmed at the reconsideration level on February 2, 2019 (Exhibit B5A/15).
>
> I am partially persuaded by the opinions of the state agency medical consultants. Specifically, I am not persuaded by their assessment that the claimant could lift and carry 10 pounds occasionally and frequently. I acknowledge that this assessment was supported by the evidence in the record at the time of their review during 2018, specifically including evidence of Dr. Fuentes's consultative report performed only shortly after the claimant had injured her collarbone in 2018 (Exhibits B3A, B5A, and B6F). However, this assessment is inconsistent with subsequently received evidence that the claimant's right clavicle fracture had healed, Dr. Patel's finding that the claimant could lift light objects in 2019, the claimant's own complaints that she had difficulty when gripping heavy objects, and evidence that the claimant did not pursue additional treatment for this impairment following her recovery (*See* Exhibits 8F, 10F, and 15F). Overall, this evidence supports a finding that the claimant has less limitation in lifting and carrying than assessed by the state agency medical consultants in 2018 and could perform a range of light work. I am also not persuaded by the assessment that the claimant frequently climb ramps and stairs, kneel, stoop, and crouch. In light of the claimant's reported pain, degenerative disc disease, and connective tissue disorder, I have

18

further reduced these postural activities to occasional and added a limitation that the claimant should avoid extreme cold and vibration. However, I am persuaded by the remainder of the state agency medical consultants' opinions because they are supported by and consistent with the record, as discussed above. For these reasons, I am partially persuaded by the opinions of the state agency medical consultants.

(Tr. 21-22.)

The ALJ analyzed Dr. Sustersic's opinions as follows:

The claimant's own physician, Jason Sustersic, D.O., completed a medical source statement on behalf of the claimant on May 31, 2019 (Exhibit B11F). Dr. Sustersic reported that the claimant could lift five pounds occasionally and less than five pounds frequently. He noted the claimant had weakness of her left wrist and right shoulder pain (Exhibit B11F/1). She could rarely perform postural activities due to her wrist weakness and right shoulder pain (*Id*.). She could rarely, reach, push/pull, perform fine and gross manipulation. She had severe pain that would cause interference with concentration, take the person off task, and cause absenteeism (*Id*. at 2).

Dr. Sustersic completed a second medical source statement on behalf of the claimant on November 10, 2020 (Exhibit B16F). Dr. Sustersic reported that the claimant can lift less than 10 pounds occasionally and frequently. Standing and walking were limited to a total of two hours. The claimant could never climb, stoop, or crouch; she could rarely kneel and crawl; she could frequently balance. She had severe pain that would cause interference with concentration, take the person off task, and cause absenteeism (*Id*. at 2).

I am not persuaded by Dr. Sustersic's opinions. First, Dr. Sustersic's opinions are quite conclusory and cite to no objective clinical findings to support the extent and severity of limitations assessed (Exhibits B11F and B16F). Second, the extent and severity of limitations assessed by Dr. Sustersic are unsupported by his own treatment notes which reflect routine and conservative treatment for the claimant's complaints and findings of normal movement of all extremities, normal muscle strength and tone, normal reflexes, normal sensation (*See* Exhibit B14F). Third, the extent and severity of limitations assessed by Dr. Sustersic are inconsistent with the evidence in the record as a whole. For example, the claimant received very little follow up treatment for her pain. She reported relief with injections (Exhibit B15F/4). In addition, at the consultative examination in February 2019, the claimant was able to lift, carry, and handle light objects (Exhibit 10F). During this examination, the claimant's fine and gross manipulative abilities were also described as grossly normal (*Id*.). Furthermore, the claimant reported driving, washing dishes, and doing housework (Exhibit B4E and Hearing Testimony). Therefore, because the opinions are not supported by the evidence, they appear to rely quite heavily on the claimant's subjective report of symptoms

19

> and limitations and to uncritically accept as true most, if not all, of what the
> claimant reported. However, as explained elsewhere in this decision, there
> exist good reasons to question the consistency of the claimant's subjective
> complaints with the objective evidence. For these reasons, I am not persuaded
> by Dr. Sustersic's opinions.

(*Id.* at 21.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 404.1520c(a).  The ALJ considered the supportability and consistency of the state agency reviewing physicians' opinions, discussing evidence that was unsupportive of disability in the process.  (*Id.* at 21-22.)  Giacomelli argues that the ALJ "seemingly determined that the reviewing physicians' opinions related to [her] ability to lift and carry only as they relate to [her] clavicle fracture."  (Doc. No. 8 at 14.)  While that may be true as to the ALJ's statements that the right clavicle fracture had healed and Giacomelli did not seek further treatment for this impairment following recovery, the ALJ also identified evidence unrelated to Giacomelli's clavicle fracture in discounting the state agency reviewing physicians' opinions: Dr. Patel's 2019 finding that Giacomelli could lift light objects and Giacomelli's own statements that she struggled when gripping heavy objects.  (Tr. 22.)

Giacomelli also challenges the ALJ's reliance on Dr. Patel's finding that she could lift light objects, arguing that the ALJ "failed to cite other portions of that examination" where Dr. Patel found decreased sensation in both hands, bilateral epicondyle tenderness, right shoulder tenderness, and moderate restrictions due to her right shoulder pain.  (Doc. No. 8 at 14.)  Contrary to Giacomelli's assertion, the ALJ included these findings in the analysis of Dr. Patel's opinion.  (Tr. 19-20.)  In addition, the ALJ correctly stated that Dr. Patel found Giacomelli "was able to lift, carry and handle light objects" during the examination.  (*Id.* at 19, 528.)  It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Giacomelli would weigh the evidence differently, it is not for the Court to do so on appeal.

Again, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

To the extent Giacomelli argues that the ALJ erred in failing to discuss the consistency of Dr. Sustersic's opinions with those of the state agency reviewing physicians, even assuming that constituted error under the Revised Regulations, any such error is harmless. *See Ingram v. Comm'r of Soc. Sec.*, Case No. 1:20-cv-2692, 2022 WL 2237807, at *7 (N.D. Ohio June 22, 2022) ("Once the ALJ determines that a medical source opinion is unpersuasive as unsupported by the source's own examination findings and provides a coherent explanation for why, any failure to also explain whether the source's opinion was consistent with other medical and nonmedical evidence is necessarily harmless.") (citing *Okonski v. Comm'r of Soc. Sec.*, No. 3:20-cv-1614, 2021 WL 4951763, at *——, 2021 U.S. Dist. LEXIS 204564, at *30 (N.D. Ohio Oct. 25, 2021); *DeBerry v. Comm'r of Soc. Sec. Admin.*, 352 F. App'x 173, 176 (9th Cir. 2009)). "Thus, any shortcoming in the ALJ's compliance with 20 C.F.R. § 404.1520c in this case provides no basis for remand." *Id.*

In reading the ALJ's decision as a whole, as the Court must do, the Court can follow the ALJ's reasoning. A perfect opinion is not required. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.") (citations omitted); *see also NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.").

## B.     RFC Determination

In her second assignment of error, Giacomelli argues that the ALJ erred in finding her capable of performing a range of light work.  (Doc. No. 8 at 15.)  Giacomelli asserts that the ALJ failed to account

for the January 10, 2020 treatment notes from Dr. Sustersic, despite being ordered to consider them by the Appeals Council.[6]  (*Id.* at 16.)  Giacomelli maintains that these treatment notes relate back the period at issue and document her ongoing left thumb impairment.  (*Id.* at 17.)  According to Giacomelli, these treatment notes "confirm[] the fine hand manipulation limitations" to which she testified.  (*Id.*)  Giacomelli further argues the ALJ failed to determine whether her left thumb impairment was severe and failed to consider this impairment when determining the RFC.[7]  (*Id.* at 17-18.)  Therefore, "the ALJ ignored evidence that could have potentially affected more restrictive residual functional capacity, or even an absolute finding of disability."  (*Id.* at 18) (citation omitted).

The Commissioner responds that substantial evidence supports the ALJ's RFC assessment.  (Doc. No. 10 at 11.)  The Appeals Council directed the ALJ to consider the January 10, 2020 treatment notes "in conjunction with the overall record evidence and make a reasoned conclusion about Plaintiff's RFC," and the ALJ did so.  (*Id.* at 11-12.)  Based on the ALJ's review of the record evidence, including these treatment notes, the ALJ found Giacomelli capable of a reduced range of light work.  (*Id.* at 12.)  In addition, according to the Commissioner, Dr. Sustersic's 2020 treatment notes "represented an improvement in Plaintiff's condition since February 2019 when Dr. Patel found slightly reduced strength" in the right shoulder and elbow.  (*Id.* at 13.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the

---

[6] Giacomelli concedes the October 2020 treatment notes from Dr. Sustersic are irrelevant to the period at issue.  (Doc. No. 8 at 17 n.5.)

[7] To the extent Giacomelli intends to raise a Step Two argument in this single sentence, the Court deems it waived for lack of development.  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of

23

the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

In discussing the remand order from the Appeals Council, the ALJ explained as follows:

> The claimant submitted or informed me about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 404.935(a)). In making this finding, as noted above in the Appeals Council Order, the claimant had submitted evidence from Jason Sustersic, D.O. within five days of the January 7, 2021 hearing, but this evidence was not exhibited and no explanation was provided as for its omission. These six pages of additional evidence, consisting of Dr. Sustersic's treatment notes from visits with the claimant on January 10, 2020 and October 28, 2020, have now been exhibited in the current record as Exhibit B17F. Additionally, although I have considered this additional evidence, I find it to have limited relevance to the current determination of the claimant's disability prior to her December 31, 2019 date last insured because the treatment dates are subsequent to the claimant's date last insured. Nevertheless, this evidence has been reviewed and considered in the decision herein.

(Tr. 11.)

Substantial evidence supports the RFC findings.  In addition to considering Dr. Sustersic's January 10, 2020 treatment notes,[8] the ALJ noted Giacomelli's reports of left thumb pain in the RFC analysis.  (*Id.* at 18-19, 22.)  After discussing the record evidence, the ALJ found as follows:

> In sum, I find the claimant can perform light work with additional limitations. As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent with the evidence of record and weigh against a finding of disability.
>
> The claimant testified to significant pain and limitation in her hands and right shoulder, but this is not supported by physical examinations and the claimant's response to treatment. The record reflects treatment for right acromion fracture in September 2018. In addition, the claimant has complained of pain in her left thumb and difficulty holding onto heavy objects and a history of carpal tunnel release. Medical records note some ongoing pain with overhead reaching, relieved with an injection in January 2019. At the consultative examination in February 2019, the claimant was able to lift, carry, and handle light objects. Fine and gross manipulative abilities were grossly normal. She reported driving, washing dishes, and housework. She did not seek any follow up treatment with Dr. Panteck until December 2019. Physical examinations reflect tenderness and painful range of motion in the claimant's right shoulder. I have considered the claimant's increased pain in addition to her degenerative disc disease and connective tissue disorder. For these reasons, I find the claimant can never climb ladders, ropes, or scaffolds; no crawling; she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and overhead reach; she can frequent handle, finger, and reach laterally; she can never have exposure to extreme cold, vibration, or hazards (heights, machinery, commercial driving).
>
> Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by the objective medical evidence, testimony taken at the hearing where consistent with the record, the claimant's activities of daily living, and her response to treatment.

(*Id.* at 22.)

While Giacomelli interprets the records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's

---

[8] The Court notes the physical examination found tenderness to palpation of the left wrist, mainly "on the anterior aspect at the base of the thumb," but normal range of motion, muscle tone, and strength.  (Tr. 594.)

25

decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: May 23, 2024                                     _s/ Jonathan Greenberg_
                                                        Jonathan D. Greenberg
                                                        United States Magistrate Judge